CLOSED, ECF, RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:04-cv-08294-RO
### Internal Use Only

Arthur v. Raines et al
Assigned to: Judge Richard Owen
Related Case: 1:04-cv-07688-RO
Cause: 28:1331 Fed. Question: Other

Date Filed: 10/20/2004
Jury Demand: Plaintiff
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Federal Question

#### Plaintiff

**Patricia B. Arthur**
*individually and derivatively on behalf of*
*Nominal Defendant Federal National*
*Mortgage Association*
*also known as*
Fannie Mae

represented by **Leigh R. Lasky**
Lasky & Rifkind, Ltd (Chic)
351 Hubbard Street, Ste. 406
Chicago, Il 60610
(312)634-0057
Fax: (312)634-0059
Email: lasky@laskyrifkind.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

#### Defendant

**Franklin D. Raines**

#### Defendant

**Timothy Howard**

#### Defendant

**Daniel H. Mudd**

#### Defendant

**Stephen B. Ashley**

#### Defendant

**Kenneth M. Duberstein**

#### Defendant

**Thomas P. Gerrity**

#### Defendant

**Ann Korologos**

#### Defendant

**Frederic V. Malek**

#### Defendant

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
DEPUTY CLERK

**Donald B. Marron**

**Defendant**

**Anne M. Mulcahy**

**Defendant**

**Joe K. Pickett**

**Defendant**

**Leslie Rahl**

**Defendant**

**H. Patrick Swygert**

**Nominal Defendant**

**Federal National Mortgage Association**
*Federally chartered corporation*
*also known as*
Fannie Mae

| Date Filed | # | Docket Text |
|---|---|---|
| 10/20/2004 | ●1 | COMPLAINT against Stephen B. Ashley, Kenneth M. Duberstein, Thomas P. Gerrity, Timothy Howard, Ann Korologos, Frederic V. Malek, Donald B. Marron, Daniel H. Mudd, Anne M. Mulcahy, Joe K. Pickett, Leslie Rahl, Franklin D. Raines, H. Patrick Swygert. (Filing Fee $ 150.00, Receipt Number 523386)Document filed by Patricia B. Arthur.(laq, ) Additional attachment(s) added on 11/23/2004 (laq, ). (Entered: 10/21/2004) |
| 10/20/2004 | ● | SUMMONS ISSUED as to Stephen B. Ashley, Kenneth M. Duberstein, Thomas P. Gerrity, Timothy Howard, Ann Korologos, Frederic V. Malek, Donald B. Marron, Daniel H. Mudd, Anne M. Mulcahy, Joe K. Pickett, Leslie Rahl, Franklin D. Raines, H. Patrick Swygert. (laq, ) (Entered: 10/21/2004) |
| 10/20/2004 | ●2 | RULE 7.1 DISCLOSURE STATEMENT. Document filed by Patricia B. Arthur. (laq, ) Additional attachment(s) added on 11/16/2004 (laq, ). (Entered: 10/21/2004) |
| 10/20/2004 | ● | CASE REFERRED TO JUDGE Rochard Owen as possibly related to 1:04-cv-7688. (laq, ) (Entered: 10/21/2004) |
| 10/20/2004 | ● | Case Designated ECF. (laq, ) (Entered: 10/21/2004) |
| 12/02/2004 | ●3 | NOTICE of Judicial Panel on Multidistrict Litigation the Motion of Federal National Mortgage Association to Transfer and Consolidate for Pretrial Proceedings and Accompanying Memorandum. Document filed by Federal National Mortgage Association. (Attachments: # 1 Exhibit)(Murata, Kenneth) (Entered: 12/02/2004) |
| 12/07/2004 | ● | CASE ACCEPTED AS RELATED TO 1:04-cv-7688. Notice of Assignment to follow. (laq, ) (Entered: 12/10/2004) |
| 12/07/2004 | ●4 | NOTICE OF CASE ASSIGNMENT to Judge Richard Owen. Judge Unassigned no longer assigned to the case. (laq, ) Additional attachment(s) added on |

| | | 12/10/2004 (laq, ). (Entered: 12/10/2004) |
|---|---|---|
| 12/10/2004 | ◑ | Magistrate Judge Theodore H. Katz is so designated. (laq, ) (Entered: 12/10/2004) |
| 12/10/2004 | ◑ | Mailed notice to the attorney(s) of record. (laq, ) (Entered: 12/10/2004) |
| 01/12/2005 | ◑5 | NOTICE of of Filing with the Judicial Panel on Multidistrict Litigation a Notice of Tag-Along Action. Document filed by Federal National Mortgage Association. (Attachments: # 1 Exhibit)(Murata, Kenneth) (Entered: 01/12/2005) |
| 01/12/2005 | ◑6 | NOTICE of of Filing with the Judicial Panel on Multidistrict Litigation a Notice of Tag-Along Motion. Document filed by Federal National Mortgage Association. (Attachments: # 1 Exhibit)(Murata, Kenneth) (Entered: 01/12/2005) |
| 01/12/2005 | ◑7 | NOTICE of of Filing with the Judicial Panel on Multidistrict Litigation a Reply in Support of Fannie Mae's Motion to Transfer and Coordinate for Pretrial Proceedings. Document filed by Federal National Mortgage Association. (Attachments: # 1 Exhibit)(Murata, Kenneth) (Entered: 01/12/2005) |
| 07/19/2005 | ◑8 | CERTIFIED TRUE COPY OF CONDITIONAL MDL TRANSFER OUT ORDER FROM THE MDL PANEL...transferring a certified copy of the order, docket sheet, complaint and rule 7.1 from the U.S.D.C. (S.D.N.Y) to the United States District Court - District of Columbia. (Signed by Judge MDL Panel on 05/17/2005) (jeh, ) Additional attachment(s) added on 7/26/2005 (jeh, ). (Entered: 07/26/2005) |
| 07/19/2005 | ◑ | MDL TRANSFER OUT: Mailed certified copy of documents numbered 1-2, docket entries and transfer order along with letter of acknowledgment to the United States District Court - District of Columbia. Mailed via Federal Express AIRBILL # 8456 2042 4519 on 07/26/2005. (jeh, ) (Entered: 07/26/2005) |

A CERTIFIED TRUE COPY

MAY 17 2005

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

U.S. DISTRICT COURT
FILED
JUL 19 2005

RELEASED FOR PUBLICATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

MAY 17 2005

FILED
CLERK'S OFFICE

## DOCKET NO. 1668

# BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE FEDERAL NATIONAL MORTGAGE ASSOCIATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

### TRANSFER ORDER

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY
DEPUTY

This litigation presently consists of ten actions: seven actions in the District of the District of Columbia and one action each in the District of New Jersey, the Southern District of New York and the Southern District of Ohio.[1] Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, by the Federal National Mortgage Association (Fannie Mae) and affiliated individuals to centralize all but one of these actions in the District of the District of Columbia for coordinated or consolidated pretrial proceedings. Plaintiff in one District of Columbia securities action along with plaintiffs in the four District of Columbia derivative actions and the ERISA action pending there support the motion. The two Ohio plaintiffs which have already been appointed as lead plaintiffs[2] oppose 1407 centralization. If the Panel deems centralization appropriate, they suggest centralization of only the securities actions in the Southern District of Ohio. The New Jersey derivative plaintiff opposes inclusion of his action in MDL-1668 proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the District of the District of Columbia will serve the convenience of the parties and witnesses and promote the just and efficient

---

[1]    Eight other District of Columbia and two other New York securities actions on the MDL-1668 motion have been dismissed. Accordingly, the question of inclusion of these dismissed actions in MDL-1668 proceedings is moot.

One other action – *Jeffrey Bader v. Franklin D. Raines, et al.*, D. New Jersey, C.A. No. 2:05-175 – was not included on the MDL-1668 motion and is now included in this transfer order. All parties to this action had notice of the proceedings before the Panel relating to Section 1407 centralization and had an opportunity to participate in those proceedings by stating their respective positions in writing and during the Panel's hearing session.

The Panel has been notified that seven potentially related actions have recently been filed as follows: six actions in the District of the District of Columbia and one action in the Southern District of New York. These actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

[2]    Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio.

- 2 -

conduct of the litigation.  All actions share factual questions arising out of alleged accounting irregularities at Fannie Mae as detailed in the September 2004 Office of Federal Housing Enterprise Oversight report.  Whether the actions be brought by securities holders seeking relief under the federal securities laws, shareholders suing derivatively on behalf of Fannie Mae, or participants in Fannie Mae's retirement savings plans suing for ERISA violations, all actions can be expected to focus on a significant number of common events, defendants, and/or witnesses. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings (especially with respect to questions of class certification), and conserve the resources of the parties, their counsel and the judiciary.  *See In re Enron Corp. Securities, Derivative & "ERISA" Litigation,*  196 F.Supp.2d 1375 (J.P.M.L. 2002).

The Panel is persuaded that the District of the District of Columbia is an appropriate transferee district for this litigation.  We note that i) Fannie Mae is headquartered within the District of Columbia and documents and witnesses can likely be found there, ii) securities, derivative and ERISA actions are already pending in the District of Columbia district, and iii) this district is readily accessible for parties and witnesses.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions on the attached Schedule A pending outside the District of the District of Columbia are transferred to the District of the District of Columbia and, with the consent of that court, assigned to the Honorable Richard J. Leon for coordinated or consolidated pretrial proceedings with the actions pending there.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# SCHEDULE A

MDL-1668 -- In re Federal National Mortgage Association Securities, Derivative & "ERISA" Litigation

### District of District of Columbia

*Vincent Vinci v. Federal National Mortgage Association, et al.*, C.A. No. 1:04-1639
*Sidney Horn, etc. v. Franklin D. Raines, et al.*, C.A. No. 1:04-1783
*David Gwyer v. Federal National Mortgage Association, et al.*, C.A. No. 1:04-1784
*Richard Mandel v. Timothy Howard, et al.*, C.A. No. 1:04-1827
*Anne E. Flynn, et al. v. Fannie Mae, et al.*, C.A. No. 1:04-1843
*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust, etc. v. Franklin D. Raines, et al.*, C.A. No. 1:04-1852
*Hedda Rudoff, etc. v. Franklin D. Raines, et al.*, C.A. No. 1:04-1960

### District of New Jersey

*Jeffrey Bader v. Franklin D. Raines, et al.*, C.A. No. 2:05-175

### Southern District of New York

*Patricia B. Arthur, etc. v. Franklin D. Raines, et al.*, C.A. No. 1:04-8294

### Southern District of Ohio

*Ohio Public Employees Retirement System, et al. v. Fannie Mae, et al.*, C.A. No. 2:04-1106

04 CV

8294

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PARTICIA B. ARTHUR, Individually and
Derivatively On Behalf of Nominal Defendant
FEDERAL NATIONAL MORTGAGE
ASSOCIATION (a/k/a "FANNIE MAE"),

                Plaintiff,

-against-

FRANKLIN D. RAINES, TIMOTHY HOWARD,
DANIEL H. MUDD, STEPHEN B. ASHLEY,
KENNETH M. DUBERSTEIN, THOMAS P.
GERRITY, ANN KOROLOGOS, FREDERIC V.
MALEK, DONALD B. MARRON, ANNE M.
MULCAHY, JOE K. PICKETT, LESLIE RAHL,
H. PATRICK SWYGERT,

                Defendants,

-and-

FEDERAL NATIONAL MORTGAGE
ASSOCIATION (a/k/a "FANNIE MAE"), a
Federally Chartered Corporation,

                Nominal Defendant.

: Civil Action Number:
: A TRUE COPY
: J. MICHAEL McMAHON, CLERK

: BY
: DEPUTY CLERK
: **SHAREHOLDER DERIVATIVE**
: **COMPLAINT**

: Jury Trial Demanded

RECEIVED

OCT 20 2004

U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, by her attorneys, hereby alleges upon personal knowledge as to herself, her own

acts and upon information and belief as to all other matters, based upon, *inter alia,* an

investigation conducted by her counsel, which included, among other things, the review of

documents filed with the United States Securities and Exchange Commission ("SEC"), press

releases, a report by the Office of Federal Housing Enterprise Oversight, and other publicly

disseminated statements, as follows:

## JURISDICTION AND VENUE

1.    Fannie Mae is a federally chartered corporation under 12 U.S.C. §

1717(a)(2)(B), and the National Housing Act, 12 U.S.C. § 1723a(a), confers subject matter

jurisdiction upon this Court.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) insofar as

many of the acts and practices complained of herein occurred in this District and the securities at

issue were traded on exchanges located in this District.

## NATURE OF THE CASE

3.    This is a shareholder derivative action brought by a shareholder of

Nominal Defendant Federal National Mortgage Association (a/k/a "Fannie Mae") (hereinafter

referred to as "Fannie Mae" or the "Company") on behalf of Fannie Mae, to recover damages for

the Company.

4.    The Defendants breached their fiduciary duties of loyalty, reasonable

inquiry, oversight, good faith and supervision by failing to act in the interest of Fannie Mae

shareholders as described herein.

5.    The Office of Federal Housing Enterprise Oversight ("OFHEO") has

conducted an investigation into the accounting practices at Fannie Mae and concluded the

Company purposefully violated Generally Accepted Accounting Principals ("GAAP"),

maintained poor internal controls, and created false documents in an effort to cause the

appearance that Fannie Mae had smooth and stable earnings and to understate the underlying

volatility and risks related to its mortgage portfolio.

6.    Specifically, the OFHEO report confirmed that Fannie Mae's accounting

did not comply with GAAP and that Fannie Mae: 1) intentionally and improperly applied SFAS

2

91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Indirect Costs of Leases*, creating "cookie jar" reserves in its accounting for amortization of deferred price adjustments; 2) intentionally misapplied SFAS 133, *Accounting for Derivative Instruments and Hedging Activities*, by misclassifying hedges as cash-flow hedges, failing to reflect the proper effectiveness of hedges under the rule, and failing to maintain documentation on the hedges as required by the accounting pronouncement; 3) tolerated serious internal control deficiencies, including a poor framework for developing critical accounting policies within the organization, and allowing the Chief Financial Officer to oversee the audit group and influence their compensation; and (4) deferred expenses to achieve bonus compensation targets.

7.    As a result of these failures, Fannie Mae and its shareholders have been damaged because: 1) Fannie Mae may not hold adequate regulatory capital because the accounting improprieties detailed herein propped up the amount of capital the Company appeared to hold as a percentage of its underlying portfolio; 2) Fannie Mae will likely be required to restate its financial results for numerous periods; 3) the Company will undergo cumbersome additional regulatory oversight; and 4) the Company will incur significant expense and liability as a direct result of the improper conduct alleged herein as is contained in the OFHEO report.

## THE PARTIES

Plaintiff

8.    Plaintiff has been the owner of Fannie Mae common stock contemporaneously with the commission of the acts complained of herein and continuously to date.

3

Nominal Defendant

9.    Nominal Defendant Fannie Mae is a federally chartered corporation with principal corporate offices located at 3900 Wisconsin Avenue, Washington, DC. Fannie Mae buys and holds mortgages, and issues and sells guaranteed mortgage-backed securities to facilitate housing ownership for low- to middle-income Americans. The Company was chartered by the United States Congress, and went public in 1970.

Defendants

10.    Defendant Franklin D. Raines ("Raines") was Chairman of Fannie Mae's Board and Chief Executive Officer since January 1999. During 2003 alone, Defendant Raines received salary and bonus of $5.4 million and $11.6 million in payouts under Fannie's long-term incentive plan. The Defendants permitted Fannie Mae to have targets set for Defendant Raines whereby if Raines were to double profit growth in five years, he would receive options for 213,548 shares which would vest at an exercise price of $62.50. Defendant Raines was responsible for the certification of Fannie Mae's financial statements to its shareholders.

11.    Defendant Timothy Howard ("Howard") was Fannie Mae's Vice Chairman of the Board and Chief Financial Officer since May 2003. Defendant Howard oversaw the audit group while simultaneously determining compensation. Internal e-mails at Fannie Mae corroborate that Defendant Howard was the principal individual responsible for maintaining accounting policies at Fannie Mae which were in violation of GAAP and served to make Fannie Mae's reported earnings less volatile and more smooth. Defendant Howard was also ultimately responsible for the certification of Fannie Mae's financial statements to its shareholders. Defendant Howard was an active seller of his Fannie Mae shares during all relevant periods.

4

12.     Defendant Daniel H. Mudd ("Mudd") was Fannie Mae's Vice Chairman of the Board and Chief Operating Officer since February 2000.

13.     Defendant Stephen B. Ashley ("Ashley") has been a director of the Company since 1995.

14.     Defendant Kenneth M. Duberstein ("Duberstein") has been a director of the Company since 1998. Defendant Duberstein also runs a consulting company, which received $375,000 of revenue from Fannie Mae in 2003.

15.     Defendant Thomas P. Gerrity ("Gerrity") has been a director of the Company since 1990.

16.     Defendant Ann Korologos ("Korologos") has been a director of the Company since 1994. Defendant Korologos was also chairman of the Aspen Institute between 1996 and 2000, a non-profit educational institution which accepted grants of $280,000 from Fannie Mae over the past eight years.

17.     Defendant Frederic V. Malek ("Malek") has been a director of the Company since 2002. Defendant Malek is also a partner with Defendant Raines in a group of investors seeking to bring Major League Baseball to Washington, DC. Defendant Malek and an his independent investment firm were recently fined $250,000 by the SEC for civil charges of securities law violations.

18.     Defendant Donald B. Marron ("Marron") has been a director of the Company since 2001.

19.     Defendant Anne M. Mulcahy ("Mulcahy") was a director of the Company from 2000 until she resigned in September 2004. Defendant Mulcahy was a member of Fannie Mae's compensation committee.

5

20. Defendant Joe K. Pickett ("Pickett") has been a director of the Company since 1996.

21. Defendant Leslie Rahl ("Rahl") has been a director of the Company since 2004.

22. Defendant H. Patrick Swygert ("Swygert") has been a director of the Company since 2000. Defendant Swygert is also president of Howard University, which has accepted over \$500,000 in grants from Fannie Mae over the past 20 years.

23. In 2003 Fannie Mae raised the fees it pays the above directors for attending meetings by nearly 150%, and gave each director a one-time, lump-sum payout of approximately \$192,000 in restricted stock. This payment was in the form of 2,600 shares paid in October of 2003.

## FACTUAL ALLEGATIONS

24. Fannie Mae buys and holds mortgages, and issues and sells guaranteed mortgage-backed securities to facilitate housing ownership for low- to middle-income Americans. One of the ways Fannie Mae mitigates its operating risk is to hedge its underlying assets – its mortgages.

25. In June 2003, Fannie Mae's regulator, the OFHEO, began an investigation into the Company's accounting practices. On August 20, 2003, the Wall Street Journal published an article indicating that OFHEO had begun subpoenaing documents from Fannie because the firm had been slow in turning over requested information, or incomplete in complying with its requests. On March 6, 2004, the OFHEO ordered Fannie Mae to revamp its accounting practices to more closely reflect losses on certain investments.

6

26.    On September 22, 2004, the OFHEO released its report on Fannie Mae

after having reviewed hundreds-of-thousands of pages of documents and interviewed many

witnesses. The report summarized its findings, in part, as follows:

> The misapplications of GAAP are not limited occurrences, but are pervasive and
> are reinforced by management. The matters detailed in this report are serious and
> raise concerns regarding the validity of previously reported financial results, the
> adequacy of regulatory capital, the quality of management supervision, and the
> overall safety and soundness of the Enterprise. The problems relating to these
> accounting areas differ in their specifics, but they have emerged from a culture
> and environment that made these problems possible. Characteristics of this culture
> include:
>
> • management's desire to portray Fannie Mae as a consistent generator of stable
> and growing earnings;
>
> • a dysfunctional and ineffective process for developing accounting policies;
>
> • an operating environment that tolerated weak or non-existent internal controls;
>
> • key person dependencies and poor segregation of duties;
>
> • incomplete and ineffective reviews by the Office of Auditing;
>
> • an inordinate concentration of responsibility vested with the Chief Financial
> Officer;
>
> • an executive compensation structure that rewarded management for meeting
> goals tied to earnings-per-share, a metric subject to manipulation by management.
>
> The tenor of earnings management is deeply ingrained at Fannie Mae and has
> given rise to accounting policies and practices that emphasize effects on earnings
> volatility, rather than faithfulness to GAAP. A key message by Fannie Mae to the
> investor community is management's ability to generate stable and growing
> earnings. This is evidenced by Fannie Mae's annual financial reports, with their
> recurring graphs of steadily increasing earnings against a backdrop of volatile
> interest rates. Less well known, but detailed in this report, is the fact that the
> desire by management to minimize earnings volatility was a central organizing
> principle in the development of key accounting policies.
>
> Management also emphasized the stable earnings imperative in its
> communications to the Fannie Mae Board of Directors. In July 2003, even as the
> accounting problems of Freddie Mac were publicly emerging, Fannie Mae's Chief
> Financial Officer, Tim Howard, made a presentation to the Board that emphasized

a "stable pattern of earnings" as a requirement for Fannie Mae if it were to be perceived as a low-risk Enterprise. Mr. Howard included in this presentation a Special Examination of Fannie Mae Privileged & Confidential Disclosure and/or Duplication Prohibited graph showing that the earnings of Fannie Mae were smoother than those of Freddie Mac and almost all other companies in the S&P 500.

     27.    The OFHEO's extensive accounting findings on Fannie Mae can broadly be delineated into three main areas: (1) violation and misapplication of SFAS 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Indirect Costs of Leases*, and violation; (2) misapplication of SFAS 133, *Accounting for Derivative Instruments and Hedging Activities*; and (3) almost nonexistent internal accounting controls including the lack of any real oversight or check on Defendant Howard, Vice Chairman and CFO, to assure the Company's compliance with accepted accounting practices.

SFAS 91

     28.    The OFHEO reported numerous problems with how Fannie Mae was amortizing purchase premiums and discounts on securities and loans as well as amortizing other deferred charges. Fannie Mae intentionally developed and implemented accounting policies to inappropriately reduce earnings volatility. By doing this, Fannie Mae created flexibility for itself to arbitrarily determine an amount of income or expense in a given period, creating a "cookie jar" effect. Fannie Mae sought to eliminate "assumption risk" and artificial volatility created by the estimation process required under SFAS 91. GAAP requires that this volatility be reflected in the financial statements.

     29.    More specifically, OFHEO found that the policies adopted by Fannie Mae:

     (a)    allowed the Company to estimate income or expense that exceeded predetermined thresholds across multiple reporting periods,

8

(b)     established an arbitrary materiality threshold for estimated income and expense to

explicitly avoid making adjustments as required under SFAS 91,

(c)     capitalized reconciliation differences as "phantom" assets or liabilities and

amortized them the same way as a 30-year mortgage,

(d)     developed estimation methods that were inconsistently applied, and implemented

processes to generate a range of estimates, allowing Fannie Mae to choose the most

advantageous estimates, and

(e)     inappropriately deferred $200 million of estimated amortization expense in 1998.

30.     The OFHEO report also stated:

...despite the importance of premium and discount amortization to the financial
statements of Fannie Mae, and despite the requirement of SFAS 91 to formulate best
estimates in good faith. *management intentionally developed accounting policies and
selected and applied accounting methods to inappropriately reduce earnings volatility
and to provide themselves with inordinate flexibility in determining the amount of
income and expense recognized in any accounting period.*

31.     Concerning the Company's internal accounting policies in conjunction

with SFAS 91, an OFHEO interview with the Senior Vice President for Financial Standards and

Taxation revealed Company admissions that its policies did not conform with GAAP:

Interview, Mr. Jonathan Boyles, August 24, 2004, pp. 12-13 (with respect to Exhibit 9A:
Purchase Premium and Discount Amortization Policy, FMSE 074523-074524)

Q: The first sentence of this paragraph states: If our catch-up moves beyond one within
two percent of combined portfolio net interest in guaranty fee income, we will book
monthly "on-top" adjustments that bring us back to within the plus or minus one percent
range within our three-year planning period. Is that a provision that you recollect
discussing with the outside auditors, KPMG?

A: I don't recall discussing that provision.

Q: Is that a provision that you had approved at all?

A: I don't recall approving it.

9

*Q: Okay. In your opinion is that provision permitted under General Accepted Accounting Principles?*

*A: No, I don't believe that would be allowed.*

SFAS 133

32.    Fannie Mae implemented SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities* on January 1, 2001. This accounting bulletin required that freestanding and certain other derivatives be carried on the balance sheet at fair-value. In addition, it established the two main types of classifications for derivatives, with different accounting treatments and criteria for each. These criteria include keeping in-depth documentation on the hedges, as well as computing complex calculations.

33.    The first classification is a *fair-value hedge*. This type of hedge, which helps eliminate financial risks inherent to Fannie Mae's business, offsets gains and losses of the value of a hedged asset. These hedges represent about 16% of Fannie Mae's total hedging activities.

34.    The second classification is a *cash-flow hedge*. This instrument hedges the cash flows an asset will pay over its life – such as a mortgage. *Cash-flow hedges* are marked-to-market quarterly, but their changes impact Accumulated Other Comprehensive Income ("AOCI") and not reported earnings. If these hedges are closed before they expire, the gain or loss on the hedge is amortized into earnings over the life of the hedged transaction – which could be quite long. These hedges account for approximately 84% of the Company's hedges.

35.    With respect to the *cash-flow hedge* and how it operates, the Company has a choice. If mortgages are prepaid (including all re-financed mortgages), Fannie Mae is forced to shorten the duration of its portfolio or lessen the length of its liabilities. It could do this by repurchasing debt, closing a swap to open a new swap (called a receive-fixed swap to offset the

10

open, existing swap), or opening a new receive-fixed swap to offset the debt position. Since SFAS 133 was put into place, Fannie Mae relied heavily on closing derivative positions and deferring the losses, rather than repurchasing the debt or immediately taking a hit to income. Fannie Mae closed approximately $32 billion in such positions in 2003 and $54 billion in 2002.

36.    The Company put on additional swaps which wound up deferring rather than recognizing the marked-to-market adjustment. By layering in swaps, Fannie Mae was able to defer potential gains and losses to prop up its near-term results. Had the Company marked-to-market its results by repurchasing the debt, its financials would have revealed a more realistic picture of the underlying risk and volatility at Fannie Mae.

37.    *Fair-value hedges* are widely recognized as the appropriate way to value financial assets or pools of assets and are used extensively in the mutual fund industry. In addition, Fannie Mae assumed that most of its hedges were "perfectly effective," meaning that the change in the fair value of the derivative was perfectly matched to the change in the fair value of the cash flows of the hedged asset. The Defendants engaged in this deception even though SFAS provides specific rules for determining criteria for perfect effectiveness. Fannie Mae never performed the impairment tests or tested the effectiveness of these hedges.

38.    Accordingly, Fannie Mae layered offsetting swaps that were not cash flow hedges by the definition of SFAS 133 rather than buying them back. This was incorrect treatment as Fannie Mae had treated the original swap and the subsequent swap as a "perfect hedge" and accounted for their changes in fair-value in AOCI rather than earnings.

39.    As to SFAS 133, the Company again admitted its policies were not in compliance with GAAP. The Company's Senior Vice President for Financial Standards and Taxation answered the OFHEO's questions as follows:

11

Q: With respect to the overall approach and the concept of assuming no ineffectiveness, do you believe that there are situations in which Fannie Mae is applying that when it's not consistent with the guidance in FAS 133?

*A: We have several known departures from GAAP in our adoption of FAS 133.* We have cleared those with our auditors. We have reported to our auditors on an annual basis the effect of those. And they were comfortable when we adopted them, and they were comfortable over the last several years when we reported the results of that work.

Q: What were the reasons for you not applying GAAP in its strict conformity?

A: As is relates to what?

Q: As it relates to 133. You said there were several departures from GAAP.

A: The purpose there was really twofold: one, we felt like in the case of the duration shortcut, we felt—if you think about duration, duration is a sensitivity of an instrument's —of the instrument to interest rates. And so, you know, FAS 133 built in the concept of a shortcut so you can match notionals and match maturities and repricing dates and assume no ineffectiveness when really a better economic hedge would be to match duration, not notionals. If somebody on the business side wanted to eliminate interest rate risk, they wouldn't necessarily match up notional or maturity. They would match up durations. Those durations would get you that. When we developed the duration shortcut, we felt like it was in the spirit of 133 while not exactly to the letter, and so we built that into our adoption of 133 because we felt like that was within the tenets of 133 of a match, and then on an annual basis, we would report back to our auditors and the management what the effect of - had we gone long haul on those transactions and not taken the duration shortcut, what that effect would have been on earnings.

40.     The Company also admitted it's accounting under SFAS 133 was

"aggressive":

> *...the accounting treatment we currently utilize for our receive-fixed swaps is aggressive (we have KPMG's approval) and not one we would want to flash in front of the FASB for comment or the treatment could get worse...*

41.     The OFHEO also cited at least one instance where the Company deferred

expenses to achieve bonus compensation targets. During 2003 alone, Defendant Raines received

salary and bonus of $5.4 million and $11.6 million in payouts under Fannie's long-term incentive

plan.

12

42.    The OFHEO concluded that the Defendants permitted to the Company to

maintain poor internal controls to the extent that there were no formal written procedures

governing the development of accounting policy at Fannie Mae. Specifically, the OFHEO report

noted weaknesses in the amortization process and qualified employee shortages in the Controller's

department:

> During our examination, we noted a number of significant control weaknesses in the process
> of accounting for amortization. A majority of these internal control weaknesses are centered
> around the AIMS system (Amortization Integration Modeling System) and the modeling
> process....
>
> Information obtained during the examination demonstrates that critical shortages of
> qualified accounting specialists existed within the Controller's Department during the period
> under review. The shortage of staff and technical accounting expertise created key person
> dependencies for crucial accounting policy development areas. The problem was
> exacerbated as Fannie Mae was challenged with fulfilling the necessary requirements to
> complete registration with eh Securities and Exchange Commission (SEC), while also
> complying with an increasing number of accounting standards that impacted their
> business....
>
> Given the technical accounting support necessary for Fannie Mae to comply with regulatory
> requirements for implementing the new standards from the FASB and registering its
> common stock with the SEC along with its regular operational activities, OFHEO believes
> that Fannie Mae management failed to adequately staff the Financial Standards function to
> sufficiently meet these requirements....OFHEO believes that management across business
> operations was aware of the lack of accounting expertise within the Controller's
> Department. However, management appears to have been slow taking action to remedy the
> situation.
>
> In addition based on evidence reviewed during our examination, OFHEO determined that
> there is limited technical accounting expertise at Fannie Mae, as the SVP of Financial
> Standards is heavily relied upon for all matters accounting related at the Enterprise.
> OFHEO noted that executives within the Controller's Department exhibit only a "high
> level" understanding of the relevant GAAP standards that support the Enterprise's
> accounting policies...

43.    On September 22, 2004, on the release of the OFHEO report, the SEC

launched an informal inquiry into the Company.

13

44.    On September 27, 2004, the *Wall Street Journal* published an article stating that Fannie Mae may have been about $4.6 billion short of meeting regulatory capital requirements in 2003 as a result of the accounting improprieties alleged herein.

45.    Since the investing public learned that the OFHEO was submitting the report, Fannie Mae's shares have dropped approximately $10 or approximately 13% on heavy trading volume, which represents a loss to the Company of approximately $9.6 billion in market capitalization.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

46.    Plaintiff brings this claim derivatively in the right and for the benefit of Fannie Mae to redress injuries suffered and to be suffered by and to be suffered by the Company as a direct result of the violations of fiduciary duties by the director Defendants.

47.    Each of the director Defendants owes to Fannie Mae and its shareholders fiduciary duties of loyalty, reasonable inquiry, oversight, good faith and supervision in the administration of the Company's affairs and accounting practices.

48.    The director Defendants breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith and supervision by failing to act in the interest of Fannie Mae shareholders. Defendants failed to ensure Fannie Mae had adequate internal controls in place and was operating in compliance with GAAP. These acts were intended to cause the appearance of smooth earnings and stability and to understate the underlying volatility and risks of Fannie Mae's portfolio of mortgages.

49.    The Defendants failure to put in place adequate controls and to oversee the Company's accounting is especially egregious considering that these concerns were raised with the board by Company employees and were raised during the accounting debacle of Fannie

14

Mac's sister company, Freddie Mac. The well-publicized Freddie Mac debacle involved the same "smoothing" of earnings issues as alleged herein.

50.    The Defendants knew or willfully failed to know that Fannie Mae was engaged in an ongoing effort to achieve as its ultimate goal the smoothing of earnings and give the false impression to the market place that its financial results were less volatile than they actually were.

51.    The director Defendants should have been apprised of the accounting improprieties alleged herein by virtue of defendant Howard's position as Vice Chairman and Chief Financial Officer. The OFHEO report confirms that defendant Howard was the architect of the accounting schemes alleged herein. Moreover, the board breached its fiduciary duties by permitting Defendant Howard to be in charge of the Company's audit group while simultaneously controlling its compensation.

52.    The actions complained of herein were not the result of the exercise of independent business judgment of independent directors.

53.    The director Defendants are incapable of applying independent judgment on the matters addressed herein.

54.    Plaintiff has not made demand on the defendants because demand is futile for the following reasons: (a) the Company's board is ineffectual as a result of their focus on maintaining the appearance of Fannie Mae's earnings as smooth and less volatile than they really are; (b) the Company's directors will not take action to correct the wrongs alleged herein in an effort to avoid personal liability; and (c) the Company's board failed to ensure that Fannie Mae cooperated fully with the OFHEO investigation, and the OFHEO was forced to subpoena

documents from Fannie Mae. Therefore, the Company's board has shown that demand would be futile.

       55.    This action is not a collusive one to confer jurisdiction on the Court it would otherwise not have.

WHEREFORE, plaintiff demands judgment as follows:

     a.    Against each director Defendant and in favor of nominal defendant Fannie Mae for the amount of damages sustained by the Company as a result of the breaches of fiduciary duties alleged herein;

     b.    Requiring the director Defendants to return to Fannie Mae all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Fannie Mae;

     c.    Ordering the director Defendants, and those under their supervision and control, to implement and enforce policies, practices and procedures on behalf of Fannie Mae and its stockholders that are designed to detect and prevent the misconduct described herein;

     d.    Awarding plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees and costs and expenses;

     e.    Ordering Fannie Mae to implement remedial measures to ensure the practices and acts as complained of herein are not repeated

     f.    Such other and further relief as is just and proper in light of all the circumstances of this case.

16

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 18, 2004

Leigh Lasky (# LL 6919)
LASKY & RIFKIND, LTD
100 Park Avenue, 12th Floor
New York, New York 10017
212-907-0700

Brian J. Robbins
Marc M. Umeda
Robbins Umeda & Fink, LLP
1010 Second Ave., Suite 2360
San Diego, CA 92101
619-525-3990

*Attorneys for Plaintiff*

17

STATE OF NEW YORK
COUNTY OF NEW YORK

## ATTORNEY VERIFICATION

The undersigned, an attorney admitted to practice in the courts of New York State, states the following to be true under penalty of perjury:

1.    Affirmant is LEIGH R. LASKY, ESQ., an attorney in the law firm of **LASKY & RIFKIND, LTD.**, attorneys of record for Plaintiff PATRICIA B. ARTHUR, in the within action;

2.    Affirmant has read the foregoing SHAREHOLDER DERIVATIVE COMPLAINT and knows the contents thereof; the same is true to affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief and that as to those matters affirmant believes it to be true. This verification is made by affirmant and not by the Plaintiff PATRICIA B. ARTHUR;

3.    The grounds of affirmant's belief as to all matters not stated upon affirmant's knowledge are as follows:  Investigations made relative to the subject matter and information and records in his file.

4.    The undersigned affirms that the foregoing statements are true, under the penalties of perjury.

Dated:        New York, New York
              October 20, 2004

                                        LEIGH R. LASKY, ESQ.
                                        Attorney Bar Code: LL6919

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          04 CV 986 #2
------------------------------------x
PATRICIA B. ARTHUR, Individually and Derivatively on
Behalf of Nominal Defendant FEDERAL NATIONAL MORTGAGE
ASSOCIATION (a/k/a "FANNIE MAE"),                    CASE NO.
                        Plaintiff
-against-
FRANKLIN D. RAINES, TIMOTHY HOWARD, DANIEL H. MUDD, STEPHEN    RULE 7.1 STATEMENT
B. ASHLEY, KENNETH M. DUBERSTEIN, THOMAS P. GERRITY, ANN
KORLOGOS, FREDERIC V. MALEK, DONALD B. MARRON, ANNE M. MULCAHY,
JOE K. PICKETT, LESLIE RAHL, H. PATRICK SWYGERT,
                        Defendants,
and ------------------------------------
FEDERAL NATIONAL MORTGAGE ASSOCIATION (a/k/a "FANNIE
MAE"), a Federally Chartered Corporation,
                        Nominal Defendant
------------------------------------x

PURSUANT TO RULE .7.1 [Formerly Local General Rule(.9] OF THE LOCAL

RULES OF THE US DISTRICT COURT FOR THE SOUTHERN AND EASTERN

DISTRICTS OF NEW YORK AND TO ENABLE JUDGES AND MAGISTRATE JUDGES

OF THE COURT TO EVALUATE POSSIBLE DISQUALIFICATION OR RECUSAL,

THE UNDERSIGNED COUNSEL FOR ___Plaintiff_____ (A

PRIVATE NON-GOVERNMENTAL PARTY) CERTIFIES THAT THE FOLLOWING ARE

CORPORATE PARENTS, AFFILIATES AND/OR SUBSIDIARIES OF SAID PARTY

WHICH ARE PUBLICLY HELD.

        NONE

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
        DEPUTY CLERK

DATE: Oct. 20, 2004 _____

FORM SDNY-9

SIGNATURE OF ATTORNEY
Bar Code: LL 6919

**United States District Court**
Southern District of New York
Office of the Clerk
U.S. Courthouse
500 Pearl Street, New York, N.Y. 10007-1213

Date:      7/26/2005

Our case #:   04-8294 (JSR)

Dear Sir/Madam,

Pursuant to an order of the MDL Panel the above case is being transferred from the Southern District of New York to the District of Columbia. Enclosed is a certified copy of the civil docket sheet for the above referenced case that is being transferred to your district. The case file can be accessed through our CM/ECF System for the Southern District of New York. Please contact either Mr. Robert Gutierrez at (212) 805-0615 or Mrs. Tracy Rubino at (212) 805-0618 for the CM/ECF Login and Password.

The enclosed copy of this letter is for your convenience in acknowledging receipt of these documents.

**Court policy for USDC-SDNY states that all ECF actions require only original, manual paper filings for the initiating documents. You may access our CM/ECF website for any additional documents that your court may require for processing.**

Yours truly,

J. Michael McMahon
Clerk of Court

By: Jenny R. Horne
       Deputy Clerk

Fed Ex: 8456 2042 4519

---

**RECEIPT IS ACKNOWLEDGED OF THE DOCUMENTS DESCRIBED HEREIN AND ASSIGNED CASE NUMBER:**

CASE #_____    ON DATE: _____

CASE TRANSFERRED OUT FORM